The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. Okay. I believe our third case for the day is number 234031, United States v. Johnson. And I believe Ms. Quattrone. Did I say that correctly? You did. Thank you, Your Honor. May it please the Court. Good morning, Your Honors. My name is Elena Quattrone and I represent the appellant, Mr. Arley Ray Johnson, along with my co-counsel here, Ms. Sarah Hall. This is an appeal from a jury verdict for Mr. Johnson's position that after a 10-day trial and a 7-day jury deliberation, he was convicted unjustly due to improper tactics by the government and rulings by the district court that were not harmless, for which he is now currently serving an unjust 78-month sentence. Mr. Johnson respectfully requests that this court vacate his conviction and remand. Well, on the issue of prosecutorial misconduct, isn't much of what you're arguing there simply vigorous advocacy by the prosecution? Yes, Your Honor. However, I think what we established in our papers and what we're prepared to address today is that there's vigorous advocacy, but then there's also crossing the line. And here, one of the themes that we want to discuss- Can I just give a preview, though? It's not whether they crossed the line. It's whether they clearly and obviously crossed the line because this claim is forfeited because it was never raised before the district court. Is that right? Are you addressing, Your Honor, the- All the prosecutorial misconduct allegations. Where were any of those raised before the district court? We are arguing for plain error. Okay, so it's not even enough that they crossed the line under prong two of Alano. They have to have clearly and obviously crossed the line, right? Correct, Your Honor, and we believe we meet that standard across our arguments. And as Your Honor points out, there are two themes addressed in our papers, that of government overreach and prosecutorial misconduct and inconsistent and unduly prejudicial rulings by the district court that created reversible error. Now, to address Your Honor's point on the question of the difference between zealous advocacy versus the plain and obvious error of crossing the line here, we believe that the prosecutions, that the activities that occurred at this trial were reflective of the prosecution's effort to do anything to convict the lowest person involved at this company that held a position of power, so as to secure a conviction unjustly. So let's start with something tangible. The first thing the prosecutors did that was clearly and obviously improper was blank. What is the first thing they did that was clearly and obviously improper? We would say their failure to correct the untruthful testimony of its witness, Femi Tamobi, Oliver Femi Tamobi, in which . . . Well, wasn't that cleared up on cross-examination? Your Honor, though it was, though this witness was . . . Well, but that happens all . . . I mean, you go try cases, this kind of thing happens every day. Somebody sort of stretches their testimony and then the other lawyer comes in. That's what you want when you're a defense lawyer. Let me prove this guy's a liar. Yeah, and I understand your point, Your Honor, and I believe, yes, we were successful in impeaching Mr. Tamobi on a very material fact to Mr. Johnson's mens rea. Of whether . . . whose idea it was to call the FBI? Correct, it was Mr. Johnson's. Well, okay. And I think . . .  Also, to the point of Mr. Johnson's knowledge and what he knew at the time and his . . . directly to his mens rea, which we believe is a material fact that the prosecution was aware of. To impeach Mr. Tamobi, we used the very grand jury testimony that the prosecutor took, or not this prosecutor, but that the government took. So, they were aware of Mr. Tamobi's position prior to being examined on this point. And we would point to the Supreme Court case, Napoo v. Illinois, which sets forth that the prosecution has an obligation to set forth truthful testimony. Which was also echoed in the recent case, Supreme Court case, Glossop v. Oklahoma, just a slide . . . But so, in Napoo or any of these other cases, did, after the prosecutor did the thing that was allegedly misleading, defense counsel get up and show in front of the jury the misleading thing they had just done? Did that happen in Napoo? It did not, Your Honor. However, we still think that given the weight of this specific testimony and the fact that it could be impeached on cross-examination, which it was. However, there's a nuance there that perhaps the jury doesn't fully appreciate or fully understand, given the nature of trial. And, I would also point out that though we were successful in impeaching Mr. Tamobi on cross-examination, the way in which we did . . . The district court did not, not that we requested, but we did not read into the actual testimony from the previous grand jury transcript. So, in the fact that Mr. Tamobi was being dodgy in his responses, it didn't provide a full picture of actually the weight of what his testimony was prior to these inconsistencies. Okay. So, the second thing the prosecution did that was clearly and obviously improper was what? We believe that the prosecution engaged in misconduct during Mr. Johnson's sentencing hearing, when they advocated for a sentencing enhancement. And, in so doing, violated Brady. Well, they didn't get it. So, it wasn't the actual request for the enhancement that was the issue. The issue was, in so advocating for this enhancement, they revealed that they viewed other alternate subjects or alternate suspects, alternate perpetrators, as being involved in this crime. How is that possibly Brady material? Your brief just asserts that that was Brady material. I have no idea how that's Brady material. Brady sets forth, Your Honor, the need for disclosures for exculpatory evidence. How is the fact that other people might have been involved in this crime exculpatory? It was the particular person named, Your Honor. The prosecutor named an individual by name who was one of Mr. Jolly, the lead person involved in this case, which was one of his close friends and confidants. He was a person that Mr. Johnson actually even joined the Postal Inspector Campbell and the government in a wire, in a recorded phone call to try to apprehend Mr. Jolly. This was a person who knew Mr. Jolly, who was aware of his whereabouts, and who potentially could have had information that would have helped Mr. Johnson. Well, potentially, and that's Brady material? Well, we believe it's Brady material also, Your Honor, because in this case, what's a unique aspect of this case, is following the motions hearing prior to trial, the court ordered that the government issue a Brady disclosure letter, given the voluminous discovery in this case. And this is a unique fact that we haven't seen in many other cases. And in that letter, which is in the J.A. at, I believe, J.A. 0242, there's no mention of these alternate suspects. And we believe that had this information been revealed, it just shows that the prosecution viewed other people as being potentially criminal liable. And I still don't understand how that's exculpatory under Brady. I think it's exculpatory under Brady, and our position is that these are people that might have had additional information that had Mr. Johnson aware. Brady is not a general disclosure rule. Brady is a rule that says you have to disclose exculpatory or impeaching information, and I don't see how other people might be criminally responsible. Is exculpatory or impeaching? I think it's due to who these specific individuals were and the information they might have held. And the support they might have been able to give, had we been aware that this is how the government viewed them, that they were actually keeping Mr. Johnson in the dark about what was going on at Smart Partners, which goes directly to his argument that he had no knowledge and his position that he has no knowledge about the activities that went on at the company. So your point is not that any one of these alleged four things of misconduct itself is a cause for reversal, but rather that we can't view them individually, we have to view them collectively, and collectively they spell out a government that's out to get your client. That's correct, Your Honor. Well, they were out to get your client, weren't they? They were, Your Honor, but we maintained, and Mr. Johnson still maintains his innocence, that he knew nothing about what was going on at this company, and we truly believe that this is an individual who was wrongfully convicted. Do you think this misconduct thing is your strongest argument in this case? If not, what is your strongest argument? I believe that we have one more prosecutorial misconduct argument that is particularly strong, that if I may preview to the court, it's the argument on the willful blindness instruction. Well, in every Ponzi case I've ever tried, they always ask for a willful blindness instruction, and the reason they do is, well, you know, if somebody on the jury thinks, maybe he didn't really know exactly what was going on, they can fall back, the jurors can fall back on this, and it's an accurate statement of the law, and it's an accurate theory, right? If they had gotten up and argued, if you don't think that he knew about this, he still can't escape it because of willful blindness, then you wouldn't have this argument, would you? Well, Your Honor, I believe that the standard calls for that the defendant has to assert guilty knowledge, but also that the evidence supports an inference of deliberate ignorance, and we don't believe that any evidence offered in the case indicates that deliberate ignorance was there. Well, some judges, like me, wouldn't grant that in a case like this, but others, I think it's pretty routine. It's always tendered. I think we fall back on the point, Your Honor, that this was an incredibly close case, again, given by the fact that the jury deliberated for almost seven days, almost as long as the trial itself. They required an Allen charge to reach a decision, and therefore any extra opportunity to convict they might have been able to take. But your argument on this point, I understand, is that you accuse the government of being inconsistent, and I don't understand what the inconsistency is. So what I understand the government is saying is we believe that he knew, and we believe the evidence is more than sufficient to conclude that he knew, but we also know his defense is I didn't know, and it's possible that some member of the jury might believe that, and therefore, and as sort of belt and suspenders, we would also like you to tell the jury just the mere fact that he technically didn't know X does not mean he's scot-free if the only reason he didn't know X is because he buried his head in the sand. I don't see what's inconsistent about the government saying both of those things. Our view is that he knew, but we recognize his argument is that he didn't, so in the event a jury believes him when he says that, we'd like this instruction. I don't see any inconsistency with the government's position at all. I think it just goes to at sentencing when the government admitted that they only ever viewed this case as Yes, that's what their view was, but they're not stupid. They recognize that at least one juror might have thought differently, and they wanted an instruction to deal with that possibility. I don't see what the inconsistency is. I understand, Your Honor. I still think, though, that this gave the jury on an incredibly close case where there was obviously some doubt raised, that it gave them an easier way to convict. That's what a willful blindness instruction does. And that's why, Your Honor, we argue against that. Well, going back to my question about your strongest argument, if we don't find prosecutorial misconduct, you've got four other arguments about Jolly leaving, about the Soweto article, cash deposits, and Marindi in uniform. Which one of those do you think is your strongest argument to get this verdict reversed? Sure, Your Honor. I would focus on the improper limitations on the cross-examination of lead case agent, Postal Inspector Campbell. Here, the district court improperly limited the defense's cross-examination of this key government witness, who, again, wasn't just a government witness. He was the lead case agent on the case. He was the witness through whom the government got in most of their evidence. And it was limiting his cross-examination on the circumstances of Mr. Jolly's leaving the country. And this is important because Postal Inspector Campbell committed in writing that Mr. Jolly fled the country. And we maintain that he did not flee, that to say that he fled is a lie. Because a person who had no legal authority to detain him didn't tackle him in the airport? I just don't understand how this isn't – why is this not fleeing? Well, because the definition of fleeing we offer is somebody leaves unbeknownst to anyone. No one knows where they're going. Well, but, you know, this guy knew the cops were looking into him about this whole Ponzi scheme. And then he said, I'm going to South Africa. Well, and he was apprehended – That's fleeing. We argue, Your Honor, that he was permitted to leave by Postal Inspector Campbell, who approached him and exercised a search warrant on his person at the airport and then permitted him to board a one-way flight to South Africa. But you mean he permitted to leave – by permitted to leave you mean did not unlawfully detain, that any failure to unlawfully detain constitutes permitting to leave? I don't necessarily think it's – we're not offering this argument to challenge, you know, what's required to prevent somebody from leaving the country. We're offering this argument to say that we think it's inappropriate to categorize it as fleeing versus just he knew he was leaving. And I believe the government made other arguments that they didn't know where he was. They knew where Mr. Jolly was. He flew to South Africa, and they let him do it. I think the other part here that – where this becomes an issue with our restriction in being able to ask or to raise credibility questions of Mr. Campbell on this point is that to further compound the error, the district court then granted the government's request to include in the jury instructions the overt act that on or about May 30, 2019, Mr. Jolly fled the United States. So, and this was tried in Maryland? Correct, Your Honor. Do they always give a list of the possible overt acts up there? I'm not sure, Your Honor. My co-counsel would probably know better than me. I do recall that there was some debate over which overt acts to send back, and this one was included. And we believe that by being permitted to provide this overt act back, it was an inaccuracy that was permitted, and though we were restricted from cross-examining on that point, it still went back with the jury. So there was an inconsistency in the ruling where we maintain that that point should not have been gone back to the jury. Well, why couldn't you just instruct the jury that they have to find an overt act by one of the conspirators to reach the goal of the conspiracy and let them decide what the overt act is? I think that's what we would have preferred, Your Honor. But at the end of the day, this particular overt act went back to the jury without our being able to question Mr. Campbell on this point on cross-examination, which would have went directly to his credibility. And I see I'm over time, Your Honor, so I'm going to step down. Thank you very much. You'll have some time on rebuttal. Thank you very much. Mr. Moore. Good morning, Your Honors, and may it please the court. Brandon Moore on behalf of the United States. In just one year, Mr. Johnson and his co-defendants defrauded victims out of $28 million of their hard-earned savings. As we heard on opening, this was an extensive trial. It was nine days of testimony, over two dozen witnesses, and then there was an additional nine days of deliberation. And at the end of this, the jury held Mr. Johnson accountable for his crimes. Didn't Mr. Johnson provide information to the government over the course of months? In fact, I think I read in the record that Mr. Campbell actually was annoyed that Mr. Johnson kept calling so much, and he invested a million, I guess, dollars of his own money, or I'm not exactly sure how much. I mean, I am sympathetic to the statement by your colleague that this is a strange prosecution. Much of the evidence of the government came from Mr. Johnson himself. He even encouraged his coworkers to call the FBI. I would agree that Mr. Johnson took several actions after the fact to call the investigators' attentions to several pieces of fact. I think we disagree as to what the motivation behind that was and then also how helpful some of that was. The background to calling Inspector Campbell incessantly and wanting to cooperate is that we had actually asked for him to get in touch with counsel to do that during the normal channels, but he didn't want to do that. I think that it's fair to construe that as just being, I believe our position on that would be that that is indicative of probably, for lack of a better analogy, like a CYA after the fact. And a lot of these things are like that. So if you're looking at when allegations are brought to Mr. Johnson's attention, the newspaper articles, the hit from South Africa, the investigative steps that he says he's going to take when he actually falls through on doing are two different things. The assurances that he gives people and then the actions that he takes with regard to the Ponzi scheme and how he continues to sign people up and benefit from that are two different things. And so this all of a sudden, we're caught, and now I'm going to give the appearances that we're going to go through all the motions so I'm trying to help the government. That's different. And I think indicative of that too is how he helps to try to identify where Mr. Djeli is in South Africa. I believe our position below was that a lot of that information that we brought to our attention was not accurate and then we had even interviewed, was it Ms. Cargbo, and still were not able to apprehend Mr. Djeli at that time. And why did the government limit the cross-examination of the inspector general? It seemed clearly to go to the credibility of Mr. Campbell. Sure, and I think the point here is I don't think we disagree on the facts, right? The way that my friend from the other side describes the facts, I don't think we disagree on those. There's a one-way ticket out of the country. This was within 10 days of us initiating our investigation. This was within days of the accounts being frozen. I think Mr. Djeli has a clear understanding that now is the time to leave. So why wasn't he permitted to ask questions about the fleeing, or whether it was a fleeing or a letting go? Because below, the position taken below, as I understand it, is to bring about an understanding of the facts that's just not representative. I think the first is that Mr. Johnson wanted to present some sort of narrative that the government either benefited from Mr. Johnson leaving or that we let him leave, and that's certainly not the case. It's just as I had said in opening. It's that we had no legal mechanism to let him leave, so it's trying to paint an inaccurate picture of what was happening. And then the second point, too, is I think there was a narrative that Mr. Johnson wanted to present that somehow he wanted to get Mr. Djeli back to the United States more than the government did, which is also inaccurate based on the facts that we had. And so I think the judge actually called this. It's to prevent this sort of sideshow. We're going to go down just a sideshow that's going to lead to any number of conclusions. The first is talking about Inspector Campbell's credibility. I think it's a totally reasonable conclusion to draw based on the uncontested facts that flight is what Mr. Djeli is actually doing. And then cross-examination on that would have only brought that to light. The second part is that— Right, but he wasn't allowed to cross-examine him on it, so he wasn't permitted to bring it to light. And that was his argument was whether or not Mr. Campbell was credible in making that assertion. True, but the district judge is also within his discretion to limit the type of testimony that's on a sub-issue, which is— The credibility of a key witness of the government that's a sub-issue? Not the credibility. See, the credibility, I think, if I'm reading the record accurately, is the thing that they're arguing now. That's not what they were arguing before when we were talking about limiting the cross-examination on that. I think what they were also asking, too, is that the government should have or was in a position to get an arrest warrant, which also would have triggered an additional instruction on whether or not it's relevant, what investigatory steps that the government took. I think there was no line of questioning that was going to be germane to the rest of what Mr. Johnson's defense was in light of the broader evidence that was being brought. Let's say—because it's true— that I'm very sympathetic to the district court's rationale for limiting the cross-examination, and at least on abuse of discretion review, I'm inclined to think it's fine. Just to say, we're not going to have debates about whether you can legally arrest someone when you have a search warrant, and we're not going to have debates about whether the government could— I can totally see the district court's rationale. This is all collateral. But what I don't see you can do is tell— because we're not going to get into what happened at Dulles and what the legal basis of doing things at Dulles were, because as you say, it's a collateral issue. Totally sympathetic. But it seems to me that once you do that, you can't send Flea back as an overt act. That you either have to choose. Either we're going to litigate the circumstances under which he left, or we're going to tell the jury Flea is an overt act. But I don't see how you can do both of those things. Oh, and that's exactly what happened. Well, that is what the district court judge did. So I'm concerned that you can't do both. So I think if I said to you my hypothesis is the district court was totally within its discretion to limit the cross this way. But once you do that, you can't send Flea back as an overt act. Because you can't prohibit the defendant from cross-examining about the circumstances where a person left and then say it's an overt act that he fled. True. Thank you for raising that point, Judge Heitens. And what actually happens is there's a colloquy, or there's a conversation at the bench between the court and the parties where there's a discussion on whether to allow that overt act in the back. And the judge makes it clear, I limited cross-examination on this point. But then you brought it out. You brought it out in your witness, Ms. Cargbo. And then you brought it out with Mr. Johnson on the stand. Part of their core defense is that, even though they're not using the word slight or Flea, that Mr. Jolly left, essentially leaving Mr. Johnson holding the bag. So they opened the door to that. I guess reopened. You closed the door, then they reopened the door is the idea? It was open, it was closed, and then they opened it again. So at that point, that's when it went back. And there was an entire discussion with the bench before allowing this in. So, again, if we're talking about arbitrary and irrational, no. There was a full-blown discussion over it. There was a back-and-forth. The judge considered all of the evidence that came in. He considered his prior ruling. And then only after that did he allow the overt act to go back. I would also mention that there were several overt acts that were alleged as part of that wire fraud conspiracy, and then Mr. Jolly fleeing is probably the least significant of those. But that would be a harmless error argument. Yes, it is. So what about this newspaper article?  That strikes me as extremely prejudicial. They couldn't cross-examine anybody about it. And who knows whether it's true or not? I don't understand why that. I got no problem with the authentication problem. But I don't understand why that isn't unduly prejudicial and essentially a form of hearsay. Do you mean like the exhibit itself coming in or just testimony about the article? Well, their whole discussion about the Soweto article, I don't understand why an article from a newspaper in South Africa is admissible in a trial in Maryland. Correct. And then to my understanding, and I could be wrong, I don't think that there was any discussion about limiting the testimony surrounding the article itself or limiting cross-examination on the article itself. I think it was just the exhibit. The physical exhibit was the issue below, I believe. Well, that's right. If something's in writing, it's entirely believable. That's what I was taught. On the one hand. And then on the other hand, it's also believable if multiple people testify about it and they corroborate each other. But to that point, again, it was not elicited for the truth of the matter. It was elicited for the impact that it had on Mr. Johnson and then what Mr. Johnson did with that and then putting Mr. Johnson on awareness. And just to be clear, once it's not offered for the truth, it's not hearsay, right? That's the definition of hearsay. That's actually correct. It's technically not hearsay, and we got an instructor. I'm technically not hearsay. If it's not hearsay, it's not excluded by Rule 802. I was trying to be nice. It is not hearsay. So the government's theory is that he was not, he can't say he didn't know about this because he had a newspaper article from South Africa that accused this guy of something. Is that what the government's use of this was? I don't think, not directly, as I believe the question is asking. It was not presented as there is fraud in South Africa, therefore there is fraud here in Maryland. It was not presented in that way. No, but he knew about it. He knew the guy was a shady character and was liable to steal money. Well, let me take a step back because the article in and of itself is insignificant without the context of multiple people bringing his attention to it, like multiple employees of the company. So the employees went and said, look at this article, what do you think about it? Yes. As people within the company, either employees or associates, are becoming aware of this article, they're bringing Mr. Johnson's attention to it because they are themselves worried about whether there's something permissible going on in the company. And you have to look through this through the lens that at the time this is happening, customers are coming in complaining that they're not getting their investments. Employees are complaining that they're not getting paid. Checks are bouncing, right? So it's part of a global scheme of there could be one explanation for why all these things are happening. It could just be mismanagement of funds. But then also a lot of employees are kind of scared about this. And then actually during Mr. Johnson's direct testimony, he acknowledges that this article was running up and down the company. Everybody was aware of it. Everybody was talking about it. And I believe that part of their defense was when Mr. Johnson confronted Mr. Jolly about this article, it was easy to dismiss it because it was easy to conclude that Mr. Jolly was not the Dennis Jolly being talked about in the article. So the fight over the exhibit is actually because there's a photograph of Mr. Jolly in the exhibit. But then to the harmlessness point, to the unduly prejudicial point, multiple witnesses testify that the picture, that there was a picture in the article, the picture was of Dennis Jolly because I know Dennis Jolly and I looked at that picture. And they also testified as to the authenticity of the actual exhibit that was brought in. If I could turn briefly to the prosecutorial misconduct claims. I think, Judge Heidens, you hit this on the head. All of these are reviewed under plein air, and Mr. Johnson just can't clear a long prong too. Talking about the misconduct, I believe, with the willful blindness instruction, I think there's a little bit of talking past each other here between me and the other side. I think the cases make clear, especially the cases that they cite in their reply, Leidy, Mancuso, Abbas. Our position the entire time is that Mr. Johnson knew, had actual knowledge of what was happening in this company. But Leidy, Mancuso, and Abbas say that as soon as Mr. Johnson takes the stand, in Fain's ignorance, which he did, it triggers the willful blindness instruction. We were quite clear during when we were going over what the injuring instructions would be. So your view is you can't get a willful blindness instruction in the following situation. The government presents evidence that someone knew, and the defense is just a reasonable doubt, reasonable doubt, reasonable doubt, reasonable doubt. It's the only defense. It's a reasonable doubt. In that situation, these cases say you can't give a willful blindness instruction. Or at least maybe you can't give a willful blindness instruction. It depends on the evidence. Sure, but if the evidence literally proves deliberate indifference, then willful blindness... Or if the defense is, it wasn't me. Like, if the government says, it was this guy and he knew, and the defendant argues, it wasn't me, you can't then give a willful blindness instruction because it doesn't respond. Or at least maybe you can't give a willful blindness instruction. Yeah, I think it would depend on the context. But your view is once he gets on the stand and says, I didn't know, you can give a willful blindness instruction. In the face of obvious signs. And so our position is that there were obvious signs. Our position the entire time is that it's obvious signs. Including this newspaper article. People keep bringing you a newspaper article saying maybe the guy you're working with is in fact a fraudster. That through his own admission, the entire company was talking about. And he just readily dismissed based off of the word of Mr. Jolly.  But once he opens the door, categorically, we get it based on the evidence that we put on, that there were obvious signs, and that he's feigning ignorance in front of those signs. So there is just no baseline misconduct in at least asking for the instruction, which we did not do until after Mr. Johnson took the stand and put on his defense and testified. We were absolutely not going to do that until then. But then you can't clear the plain error hurdles to then do that. Can I ask you about count seven? Sure. So the jury asked a question about it, and then it seems like from the record that it became clear that there was a mistake, and the government admitted the mistake, I think. But then the government didn't dismiss that count, didn't even join Johnson's motion for acquittal on that count. Why isn't that prosecutorial misconduct in and of itself? Sure. I think the background for this, which is borne out by the record, is I think at that point we realized there was a mistake. It was just figuring out what the right mechanism was. Well, it seems like there were a number of mechanisms that you didn't engage. It was easy just to join. You could have just joined Johnson's motion for acquittal on that count, or you could have just dismissed that count. But our issue was that if you look at Rule 29, there are two options for what the parties can do. A is before it goes to the jury, or C is after it comes back from the jury. We were running clear as to what to do in that middle ground, and quite frankly I think the district court handled that appropriately because B kind of takes care of that. B kind of says, well, I'll defer. I'll defer until after the jury comes back. This is not in the record, but our intention was you can gather from our admission that there was something infirm about the count that we were fully ready to agree to dismiss if the jury had convicted and brought it back.  Didn't you claim in your brief the evidence arguably still could support a conviction on counts? How? How in the world could the evidence arguably support a conviction when it's about a different person? I think the position we were taking was Scrivener's errors. Sometimes Scrivener's errors could just be regularly— Wow, we can convict somebody based on an indictment that names the wrong victim on the theory that that was a Scrivener's error? I wasn't saying it's perfect, and as I said, that we were going to— we were readily going to agree to dismissal had there been a conviction brought back. Our only problem was figuring out what the right mechanism was, and I think the district court actually helped us, helped the both of us there by just saying he was going to defer, which B allows us to do. A and C was very unclear as to whether that was going to happen, as to whether the parties could trigger that under 29A or C is how we ended up there. And then moving back to the participants in my remaining time, there are two theories to seek that enhancement. One is the one that the district judge had thought going in, and then one is the one that Mr. Johnson is really leaning into on appeal, but we were actually— which is whether there are other participants, whether there are actually other criminally responsible people. We were seeking that enhancement on the basis that we thought— of the scope of the people who were involved who may not have had criminal responsibility but played a role in the fraud, which is what that enhancement allows us to do. I think where we run into trouble is because the district judge came in assuming that you needed to have criminal responsibility to get that enhancement. He started questioning us on that, and I think only after being kind of backdoored into there, we give them one name. It's Justin Rim, and when you get to Justin Rim, there's a couple of problems with Mr. Johnson's argument. The first is that he's known about Mr. Rim the entire time. I don't think the issue is that he didn't know about Mr. Rim. I think the issue is that they didn't know the government's interpretation of its own evidence, which is not Brady. The second thing is they keep categorizing Mr. Rim as an alternative suspect. He is not. This is a Ponzi scheme. Ponzi schemes usually require a little bit of help in recruiting a couple of people. This is an additional target, not an alternative one. It's not that to the extent that Justin Rim is culpable, Mr. Johnson is not. They both can be culpable at the same time, and that's exactly what this was. This would have just gone to the scope even being more culpable, not less, and so it doesn't fit into the Brady argument. Unless the court has other questions, I will at least say that for the prosecutorial misconduct, I think our brief lays out just why the decisions we made at each of those junctures were appropriate, or there's no rule or legal basis, particularly for testifying, at least for the prosecutorial misconduct, so it doesn't meet the plain error prong. In terms of the evidentiary errors, they were all small. The district court had at least a quality, if not a lengthy one, particularly about the article. He wouldn't let it in at the motion and limine stage. We tried to admit it initially after listening testimony on it, and the district court still said no, and then only on our third try after fulsome testimony as to the article did the district court let that in. That's anything but arbitrary. That's anything but irrational, and I think that's the same problem. Did the court give a limiting instruction on that? He did. He did in real time as the articles were coming in through the different . . . Then all the way at the end when we were doing the final jury instructions, instructed again about the article coming. What was the limiting instruction? The limiting instruction was that the article could only be used for the impression and not for the truth of the matter. If there are no further questions, I ask that you affirm. Thank you. Ms. Quattrone, you have some rebuttal time? Yes, thank you. Thank you. Your Honors, the government paints a picture of facts that are not entirely true, and I believe that this is a theme of our reply brief, and I just want to address some of the points that my colleague raised here just to clarify what I believe is the record. In regards to Mr. Johnson's cooperation, that was not after the fact. He cooperated before indictment for one year, and I just want to make clear, Mr. Johnson had every interest in trying to apprehend Mr. Jolly because his sole focus was trying to return the money that Mr. Jolly and Mr. Frimpong stole from investors and stole from his own friends and family who were also investors, and who Mr. Johnson himself was an investor. So Mr. Johnson had every interest in trying to cooperate with the government and apprehend Mr. Jolly, and just because perhaps those efforts weren't successful in apprehending Mr. Jolly, who still is, as far as we know, in South Africa, has not been returned to this country that justice be served, he had every interest to do so. Secondly, and I believe Your Honors point this out, Justice Berner, I believe you pointed this out, Postal Inspector Campbell's credibility is not a sideshow. It is the core element of our criminal justice system to test the reliability and the testimony of especially the lead government witness in a case. Thirdly, Your Honors. How do you respond to the government? So you heard what I said to the government. Let's assume I'm sympathetic of the initial decision to limit cross, but then it seems troubling to send fled. And when I asked the government that question, they said, well, that's because the defendant reopened the door to what happened. What is your response to that? I want to give you a chance to respond to that. Do you mean in regards to the overt actions? To submitting fleeing to the jury is an overt act. We still believe that that was an error, and we think that it was. But the government says your client reopened the door by discussing the circumstances of him leaving. We don't necessarily think we opened the door to that. I think that the elements at which we brought that in for, and it's referring to the testimony of Cargbo and of Mr. Johnson himself, it was to show, I think, Mr. Johnson's efforts in cooperating and what he did not know. I don't think that the actual fact of whether Mr. Jolly fled or was permitted to leave was ever addressed or clarified by testimony from those other witnesses. But I guess your client argued that he was left holding the bag. I mean, another way to say I was left holding the bag is after the other guy fled. I don't know what it means to be left holding the bag without the inclusion because the real bad guy fled. Isn't that what holding the bag means? Yes, Your Honor. I think in this case it's dual purpose. I think here it's that Mr. Jolly fled, of course. He's the person who was ultimately responsible. But I think on the other hand, it's also that Mr. Johnson had no knowledge of any of this and was left holding the bag to be the scapegoat, if you will, or to be the government's easy conviction for something that was otherwise a heinous crime, of which Mr. Johnson knew nothing about. I would just briefly like to address Count 7. The issue with Count 7 is, and I just respectfully disagree with my colleague's account of what occurred with regard to Count 7. It was never articulated in hearing or to defense counsel that the prosecution would be willing to vacate that or release Mr. Johnson from a conviction on that count. So that was not understood to us. Our point of view was that if he was convicted, he'd be convicted on that count improperly. But they acquitted on that count. So what's the import of the fact that they refused to dismiss it? That's where I get stuck. Sure. I think the import is twofold. Number one, it's that the prosecution was unwilling to recognize this error and do whatever they could to convict, but also that the jury's still convicted on Count 6, which was the overarching conspiracy to commit securities fraud claim, of which this count directly related to. And I would just point out that in response to Mr. Johnson's motion for release pending appeal, the government actually stated and recognized that including this Count 7 likely confused the jury. So again, I would fall back on the point that given how clear And this is in the record. I don't have the J number, but we cite it to it in our papers. And I would just fall back on the point that given the extremely close nature of this case and the fact that anything could have changed the turn or turned the tide for our client, we feel compelled to raise these important issues because anything might have made a difference for our client's case. So I notice I'm just about time. I thank you very much for the consideration and the opportunity. Thank you, Your Honors. Counsel, thank you for your arguments. Ms. Quattroni, do I see that you're court-appointed? Yes. Well, first of all, especially in light of Public Defense Week, we would like to thank you very much as always and especially this week for your work in this case. The court relies on it to do our job and to ensure the Sixth Amendment rights of defendants are vindicated, so we very much appreciate it. Thank you, Your Honor. I appreciate it. We'll come down and proceed to Greek Counsel and go to our last case.
judges: Toby J. Heytens, Nicole G. Berner, John A. Gibney Jr.